Nina Lea ALPHIN (Surber) *v.* David Paul ALPHIN

05-285 219 S.W.3d 160

Supreme Court of Arkansas
Opinion delivered December 8, 2005

*James M. Pratt, Jr.*, for appellant.

*Ronald L. Griggs*, for appellee.

Tom Glaze, Justice. In this child-custody case, this court is asked to review the decision of the circuit court modifying custody based on a determination that there had been a substantial change in circumstances. Appellant Nina Alphin Surber (Nina) and appellee David Paul Alphin (Paul) were married in July of 1997; the couple had a daughter, Megan, in January of 1998. Nina and Paul divorced on June 3, 1999. In the divorce decree, the chancellor found that both Nina and Paul were fit parents, and awarded joint custody of Megan to both parents. However, the court awarded primary physical custody of Megan to Nina; Paul was granted visitation for one week a month, plus two separate three-week periods each summer, and one week each Christmas holiday. The trial court held that Paul should not be required to pay child support at the time of the divorce, and ruled that each party was responsible for the payment of their own attorney's fees and costs.

On January 7, 2003, Paul filed a petition for modification of the custody decree. In his petition, he alleged that, since the date of the decree, there had been a substantial change of circumstances that warranted awarding him sole custody. Following a hearing on Paul's petition, the trial court concluded that such a substantial change of circumstances had occurred, and entered an order on September 24, 2003, placing custody with Paul. Nina filed a timely notice of appeal, and appealed to the court of appeals. The court of appeals affirmed the trial court, *see Alphin v. Alphin*, 363 Ark. 566, 215 S.W.3d 586 (2005), and Nina petitioned this court for review, which we granted.

When this court grants a petition for review of a decision by the court of appeals, we review the appeal as though it had originally been filed in this court. *Jones v. Billingsley*, 363 Ark. 96, 211 S.W.3d 508 (2005); *Lewellyn v. Lewellyn*, 351 Ark. 346, 93 S.W.3d 681 (2002). In reviewing cases that traditionally sound in equity, we consider the evidence *de novo*, but will not reverse a trial

court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Hamilton v. Barrett,* 337 Ark. 460, 989 S.W.2d 520 (1999); *Jones v. Jones,* 326 Ark. 481, 931 S.W.2d 767 (1996). We give due deference to the superior position of the trial court to view and judge the credibility of the witnesses. *Hunt v. Perry,* 357 Ark. 224, 162 S.W.3d 891 (2004); *Noland v. Noland,* 330 Ark. 660, 956 S.W.2d 173 (1997). This deference to the trial court is even greater in cases involving child custody, as a heavier burden is placed on the trial judge to utilize to the fullest extent his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Hamilton, supra.*

At the hearing on Paul's petition to modify custody, the trial court heard the following evidence. Nina's first marriage was to Sean Zoerner. Nina and Sean, who divorced in 1994, had two children, Tyler and Kristen. Nina later married Paul in July of 1997; they had Megan in January of 1998, and divorced in 1999. Following their divorce, Nina moved to Tyler, Texas, where she lived with a boyfriend, Rob Stephens, from the spring of 1999 until the fall of 1999. In the fall of 1999, Nina and Rob broke up, and Nina called her former mother-in-law, Bessie Makepeace, to come pick her up in Texas. Bessie went to get Nina and Megan, and brought them back to El Dorado, where Nina and Megan resumed living with Paul from November of 1999 until March of 2001. During this time, Nina and Paul discussed reconciling, and even became engaged to be remarried, but the relationship failed again.

In March of 2001, Nina moved to Milford, Illinois, with Megan, where they first lived with Nina's sister until Nina could find a place of her own, which was an apartment where she and Megan lived for almost a year. Nina subsequently found a larger duplex and she and Megan moved again. In July of 2002, Nina's boyfriend, Todd Surber, moved in with Nina and Megan. Todd was the chief of police in Milford at that time. Nina, Megan, and Todd moved into yet another apartment about three or four months after they began living together. Todd was later hired as a patrol officer in Paxton, Illinois, about thirty-five miles away from Milford. His new job involved a pay raise and additional benefits, including insurance that would cover Megan.

Nina and Todd began discussing marriage, and decided to get married in late September of 2003. However, when they found out about the date of the custody hearing, they changed their

wedding date to September 3, 2003, two days before the hearing. Both Nina and Todd testified at the custody hearing that they moved up the wedding because they believed the court would "frown upon [them] not being married," but both asserted that they would have gotten married anyway, and the only thing changed as a result of the hearing was the timing.

Meanwhile, on September 10, 2002, Paul Alphin married his new wife, Michelle, who was three months' pregnant with Paul's child; that child, a daughter named Breanna, was born in February of 2003. Michelle also has two children from her former marriage to Bruce Darden, and these two boys live with Michelle, Paul, and Breanna in a three-bedroom trailer in El Dorado. Michelle testified that, although there would be room for Megan if they were able to get custody, they would probably buy a larger trailer with four bedrooms.

The trial court heard additional testimony about Nina's background and relationships. Nina testified that she had lived with her boyfriend, Rob Stevens, in Texas from the spring of 1999 to the fall of 1999, and that they engaged in sexual activity when Megan was in the home, although not in the same room. Nina stated that she saw nothing wrong with that conduct. She also averred that she believed it was okay to live with Todd Surber out of wedlock in the presence of her daughter, because they lived together as a couple. Nina denied that she only married Todd because of the court's disapproval of their living arrangement, stating that they had planned for months to get married in late September, and only moved the wedding date up when they learned the date of the hearing.

Regarding her employment, Nina testified that prior to her moving to Illinois, she worked at Wal-Mart in El Dorado. In March of 2001, she took a transfer to a Wal-Mart in Illinois so she could be closer to her home. Nina worked at that Wal-Mart for about five months, then took a job working full time at a Dairy Queen. After working briefly at a convenience store, Nina began working as a waitress at a restaurant; her schedule varied from week to week, and she generally worked Friday and Saturday nights. Todd, a police officer, worked different shifts from month-to-month, but he would come home every night, regardless of his schedule, to tuck Megan in. Nina noted that if neither she nor Todd could be home to take care of Megan, Nina's mother would look after the child. When Nina had to work nights, her mother would keep Megan; if Nina did not get off until after Megan's

bedtime, Nina's mother would take Megan home, put her to bed, and wait for Nina to come home from work. Nina also agreed that she and Todd were going to have to move from Milford, Illinois, to Paxton because of Todd's job there.

Nina also discussed her relationship with her two children from her first marriage to Sean Zoerner. She conceded that it had been over two years since she had seen those children, but explained that Sean refused to let her see them.[1] When questioned about her opinion of Paul's ability to care for Megan, Nina said that he was a good father, but she also asserted that Paul had not provided medical insurance for Megan, nor had he paid for half of the child's medical bills, as he was required to do under the divorce decree. Of Megan's relationship with Todd, Nina said that Todd helped Megan with her schoolwork and taught her how to write her name; Nina stated that Megan would "love on" Todd, and that they would go for bike rides and walks together. Nina also claimed that Megan got along well with Todd's child from his first marriage (although Todd did not have custody of that child, a ten-year-old son who lived with his mother in St. Louis).

Upon re-direct examination, Nina asserted that she thought her conduct of living with two separate men out of wedlock "was okay," and that if Megan told her that she wanted to live with her boyfriend, she would tell her daughter that she was an adult and that it was her decision to make. She also pointed out that Paul had never voiced an objection to her living with Todd.

Other witnesses also testified about the circumstances and events that had transpired since the initial custody order had been entered. Paul's mother, Bessie Makepeace, testified about Nina's abilities as a parent. Bessie stated that sometimes Nina was fine, "but she was not very patient" and sometimes was "not careful about what she would say in front of Megan." Bessie asserted that she believed Paul's home provided a more stable environment and more structure for the children.

Michelle Alphin testified that she and Paul did not live together prior to their marriage, although she conceded that she was three months pregnant with Paul's child when they married. Michelle, who was employed at a hair and nail salon in El Dorado, stated that her hours varied, but she tried to get off early to pick the

---

[1] Sean testified that he had made no efforts to keep Nina from seeing her children, and that it was Nina who had not attempted to contact them.

children up from school every day. She further said that Megan and her two children from her first marriage got along very well, and that Megan would have her own room if she came to live with Michelle and Paul. On cross-examination, Michelle agreed that Paul initiated the change-of-custody petition only after Nina sought child support from him, saying that the child-support petition was "one of the factors that caused him to file for custody."

Paul Alphin also testified at the hearing. He agreed that he never voiced an objection when Nina was living with Rob Stevens in Texas or with Todd Surber in Illinois. However, he claimed that he did, in fact, object to it. Paul asserted that the reason he sought the change of custody was that he had been having difficulty seeing Megan at the appointed times for visitation; he also noted that Nina had moved so many times in recent years, and stated that he "just [felt] that Megan would be better off in a more stable environment[.]" Paul noted that he still lived in the same location as he had at the time of the divorce. Paul agreed that Nina loved Megan, but said it was "hard to say if she does the best she can for her."

The next witness at the hearing was Todd Surber. Todd recalled meeting Nina about three years prior to the hearing, and said that they had dated continuously until they married. He noted that he had spent some nights with Nina before they moved in together in July of 2002, but asserted that they never had sexual relations in Megan's presence. On cross-examination, Todd agreed that, when they moved to Paxton for his new job, it would be the fourth move for Nina and Megan since they had moved to Illinois. Todd also conceded that he did not see anything morally wrong with living with Nina out of wedlock, stating that he did not believe Megan was affected in any way by his and Nina's living arrangements. He also stated that he and Nina got married because he "thought it would please the judge," although he said they had been planning on marrying for months.

In deciding to award custody to Paul, the trial court relied primarily on the "illicit sexual relationship" between Nina and Todd prior to their marriage. The court ruled from the bench as follows:

> [Nina] readily admits her cohabiting with Rob Stevens in Texas and Todd Surber in Illinois without the benefit of marriage. Both she [and] her new husband, Mr. Surber, . . . announce that they see

nothing wrong with this. . . . [T]he courts in the State of Arkansas . . . look upon such conduct as nothing short of an illicit sexual relationship. The recent marriage of [Nina] to [Todd] is nothing but a ruse. Both she and her husband have said as much. Both she and her husband have told us today that they did this at this point in time so it would not look bad. . . . Whether or not [Paul] objects to the illicit sexual relationship of his ex-wife is irrelevant. Simply engaging in such a relationship constitutes a change of circumstances in this state sufficient for the court to make such a finding of change of circumstances, and this goes without even considering the number of moves and whether or not there have been some problem with visitation, or even whether the dysfunctional relationship that [Nina] has with her children by Sean Zoerner should be considered. So, I am not even going to go there. Simply, the relationship is sufficient for me to get to what is in the best interest of Megan. When I view the life styles over the last several years of the parties, and particularly, their stability and most importantly, what I heard today about their availability, then I can reach no other conclusion but that it would be in Megan's best interest that she be placed with her father.

 Arkansas law is well settled that the primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. *Hamilton*, 337 Ark. at 466; *Digby v. Digby*, 263 Ark. 813, 567 S.W.2d 290 (1978). A judicial award of custody should not be modified unless it is shown that there are changed conditions that demonstrate that a modification of the decree is in the best interest of the child, or when there is a showing of facts affecting the best interest of the child that were either not presented to the chancellor or were not known by the chancellor at the time the original custody order was entered. *Campbell v. Campbell*, 336 Ark. 379, 985 S.W.2d 724 (1999). Generally, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody. *Id.* The reasons for requiring these more stringent standards for modifications than for initial custody determinations are to promote stability and continuity in the life of the child, and to discourage the repeated litigation of the same issues. *Lloyd v. Butts*, 343 Ark. 620, 37 S.W.3d 603 (2001). The party seeking modification has the burden of showing a material change in circumstances. *Campbell*, 336 Ark. at 384.

██ It is true that this court and the court of appeals have held that extramarital cohabitation in the presence of children "has never been condoned in Arkansas, is contrary to the public policy of promoting a stable environment for children, and may of itself constitute a material change of circumstances warranting a change of custody." *Word v. Remick*, 75 Ark. App. 390, 396, 58 S.W.3d 422, 427 (2001); *see also Hamilton v. Barrett, supra; Taylor v. Taylor*, 353 Ark. 69, 110 S.W.3d 731 (2003) (noting that this court has held that "a parent's unmarried cohabitation with a romantic partner, or a parent's promiscuous conduct or lifestyle, in the presence of a child cannot be abided"); *Taylor v. Taylor*, 345 Ark. 300, 47 S.W.3d 222 (2001).[2]

██ In addition, we may consider other testimony and conclude that there was sufficient evidence to support the trial court's transfer of custody. *See Campbell v. Campbell, supra; Stamps v. Rawlins*, 297 Ark. 370, 761 S.W.2d 933 (1988). In addition, we can affirm the trial court when it has reached the right result, even though it has announced the wrong reason. *See, e.g., Norman v. Norman*, 347 Ark. 682, 66 S.W.3d 635 (2002). As noted previously, a judicial award of custody should not be modified unless it is shown that there are changed conditions that demonstrate that a modification of the decree is in the best interest of the child, or when there is a showing of facts affecting the best interest of the child that were either not presented to the chancellor or were not known by the chancellor at the time the original custody order was entered. *Jones v. Jones*, 326 Ark. 481, 931 S.W.2d 767 (1996). In this case, there was evidence of changed conditions that the trial court could not have known at the time of the original custody order. Specifically, at the time of the initial decree, the court was unaware that Nina would have six or seven different residences in the span of six years. By contrast, Paul had lived in the same home since the time of the parties' divorce.

---

[2] It should be noted, however, that the *Hamilton* case and the 2001 *Taylor* case involved situations where the divorce decree and custody agreement contained a specific order by the chancellor that the custodial parent should not allow members of the opposite sex to stay overnight in his or her home when the children were present. *See Hamilton*, 337 Ark. at 463; *Taylor*, 345 Ark. at 304 (noting that the trial court had used the non-cohabitation restriction as a material factor in considering custody issues). The trial court made no such non-cohabitation order in the instant case.

■ There was also testimony regarding the stability of Paul and Michelle's schedules and their ability to establish a regular routine around picking the children up from school and being home when they went to bed. For example, Michelle testified that she made a point of leaving work every day in time to pick the children up; Paul's mother, Bessie Makepeace, testified that the children in Paul and Michelle's home had a regular routine and a fixed schedule. Nina testified that neither she nor Todd had a fixed schedule, and she agreed that there were nights when neither of them was able to be home at Megan's bedtime.

■ ■ In sum, there was sufficient evidence regarding the lack of stability that had developed in Megan's life on which the trial court could conclude that the circumstances had changed since the original decree and custody order. It is true that this court has held that a change of circumstances of the *noncustodial* parent, including a claim of an improved life because of a recent marriage, is not sufficient, standing alone, to justify modifying custody. *See Jones v. Jones*, 326 Ark. at 490. However, a noncustodial parent's remarriage may be considered as a factor in determining whether there has been a sufficient change in circumstances affecting the best interest of the child. *See Hamilton*, 337 Ark. at 467-68 (limiting *Jones* to the facts of that case[3]); *see also Walker v. Torres*, 83 Ark. App. 135, 118 S.W.3d 148 (2003). Here, not only has Paul remarried and developed a stable family life, but Nina has, during the same time period, moved frequently and has been unable to establish a regular schedule and routine for her daughter. Paul, on the other hand, has maintained a stable environment that has been enhanced by his remarriage. Given the facts of the case, we affirm the trial court's order changing custody of Megan from Nina to Paul.

DICKEY, J., dissents.

B ETTY C. DICKEY, Justice, dissenting. I must respectfully dissent. The trial court adopted a blatant double standard when it issued the change of custody order awarding custody of Megan to Paul. It focused only on Nina's cohabitation, while making

---

[3] The *Hamilton* court noted that, in *Jones*, there was evidence that the noncustodial parent's remarriage was reasonably contemplated at the time he entered into the custody agreement and, thus, could not have constituted a change in circumstances arising since the entry of the prior order. *Hamilton*, 337 Ark. at 468.

no mention of Paul's peccadilloes. The trial court, and now this court, not only ignored the double standard, but ignored the fact that any instability in Megan's life was not a changed circumstance justifying the change of custody.

There were no circumstances presented to the trial court that are materially different from when the first custody order was entered. Justice requires that we compare the circumstances presented to the court when the first order of custody was entered and the circumstances presented to the court upon a request to change custody.

> A judicial award of custody should not be modified unless it is shown that there are *changed conditions* that demonstrate that a modification of the decree is in the best interest of the child, or when there is a showing of facts affecting the best interest of the child that were either *not presented to the chancellor or were not known by the chancellor at the time the original custody order was* entered.

*Jones v. Jones*, 326 Ark. 481, 931 S.W.2d 767 (1996) (quoting *Stamps v. Rawlins*, 297 Ark. 370, 761 S.W.2d 933 (1988)) (emphasis added). Courts will generally impose more stringent standards for modifications in custody than for initial determinations of custody. *Id. See also Taylor v. Taylor*, 353 Ark. 69, 110 S.W.3d 731 (2003).

The trial judge who entered the change of custody order here was clearly offended by Nina's extramarital cohabitation. However, the cohabitation issue did not constitute a changed circumstance here, since the court originally gave Nina custody of Megan at a time when she was living with a man to whom she was not married. In addition, the judge could not possibly have viewed Paul as a better candidate to be awarded custody based upon such a moral issue. The record indicates that he allowed Nina to live with him for some time after the two were divorced, without the benefit of marriage. The record also indicates that Paul married his current wife only after she was three months pregnant. Finally, Paul's new wife testified that he was motivated to seek custody of Megan because he was ordered by the court to pay child support. While not evident that Paul's motives to gain custody were merely financial, it is troubling to award him custody when he has neither paid child support nor medical expenses, and has shown little interest in Megan until after her mother sought court-ordered child support.

The majority justified the change in custody by focusing on the unstable environment provided by Nina; however, it failed to

recognize that Megan's unstable environment was a direct result of Paul's lack of participation and the court's failure to require it. The court failed to provide for child support in its initial order, failed to caution parents about inappropriate behavior around their child, and failed to inquire about each parent's living situation. Paul did not financially participate in Megan's care, forcing Nina to depend on the charity of her family and friends for financial help and living expenses.

There simply were no changed circumstances present in the instant case to justify the change of custody order. For the foregoing reasons, I respectfully dissent.