2010 Ark. App. 58

**Donna Wilson HANNA, Appellant**

v.

**Burton Dugan HANNA, Appellee.**

**No. CA 09–214.**

Court of Appeals of Arkansas.

Jan. 20, 2010.

Judith Rebecca Pratt Hass, Fayetteville, for Appellant.

William Benjamin Putman, Fayetteville, for Appellee.

JOSEPHINE LINKER HART, Judge.

Donna Wilson Hanna appeals from an order of the Washington County Circuit Court changing custody of her two teenage children to her ex-husband Burton Dugan Hanna. On appeal, she argues that the trial court erred 1) in considering evidence that "went behind" the last order when the evidence was erroneously found to have occurred in the time since the last order, because it caused the trial court to weigh the old evidence in its analysis of whether there was a material change in circumstances and whether a change of custody was in the best interest of the children; 2) in determining that parental alienation had occurred where there was no showing that her offending acts actually caused the children to view their father in a negative light, where there was no evidence that the children were even aware of the acts, and where there was evidence that the father himself was the cause of any discord and alienation between himself and the children; 3) when it found that the noncustodial parent rebutted the presumption in favor of her relocation to Florida, because there was insufficient evidence concerning the *Hollandsworth* factors to overcome the presumption; 4) when it failed to find that the issue of relocation was not res judicata and that Burt was precluded from relitigating the issue; and 5) in removing her from the courtroom without cause and over her objection so that she was precluded from hearing the testimony of the two teenage children. We affirm.

At the outset, we acknowledge that it is axiomatic that the primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. *Alphin v. Alphin*, 364 Ark. 332, 219 S.W.3d 160 (2005). A judicial award of custody should not be modified unless it is shown that there are changed conditions that demonstrate that a modification of the decree is in the best interest of the child, or when there is a showing of facts affecting the best interest of the child that were either not presented to the trial court or were not known by the trial court at the time the original custody order was entered. *Id.* Generally, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody. *Id.* The reasons for requiring more stringent standards for modifications than for initial custody determinations are to promote stability and continuity in the life of the child and to discourage the repeated litigation of the same issues. *Id.*

The current case arises from a long and contentious series of domestic battles conducted in and out of the courtroom after the parties ended their twenty-year marriage by divorce. The parties' two children were trapped in the no-man's land of the parties' internecine struggles. Jake was sixteen and a high-school junior, and his sister Brooke was fourteen and a high-school freshman at the time of this litiga-

tion. Although various custody arrangements were attempted by the parties, the original decree vested the parties with a form of "joint custody" in which Brooke stayed with Donna and Jake stayed with Burt. When that arrangement proved unworkable, Burt ceded full custody of both children to Donna. An agreed order, entered March 16, 2007, memorialized that Donna had full custody of the children. That order also authorized Donna to relocate the children's residence outside of northwest Arkansas.

On February 5, 2008, Donna filed a document styled, "NOTICE OF CUSTODIAL PARENT RELOCATION AND REQUEST TO MODIFY VISITATION SCHEDULE," in which she announced her intention to give "the Court and Defendant" notice of her intention to remove the children to Naples, Florida. That pleading also prayed for a revision of the visitation schedule. Burt immediately opposed the move and petitioned for a change in custody. In his pleadings, Burt alleged that Donna had "engaged in systematic and continuous acts designed to alienate the parent-child relationship between [Burt] and the parties' minor children." The matter came to a final-merits hearing on August 14, 2008.

At the hearing, the July 30, 2008 deposition of psychiatrist Dr. Bradley Diner was introduced. He first became involved with the parties in November 2006, when the trial court commissioned him to conduct psychological evaluations of Burt, Donna, Jake, and Brooke. Based on his studies, he opined that some of the problems between Burt and his children were the result of Burt's parenting style. Based on his conversations with the children, he be-

lieved that there was "no question the children want to be with their mother." Further, he did not believe that Donna was trying to alienate the children. Nonetheless, he was concerned about Donna not getting counseling to help her deal with her history of childhood sexual abuse. He opined that her experience seemed to have made her "hypersensitive" about the possibility of molestation involving her daughter Brooke. He also evaluated certain emails sent by Donna to Burt, and he opined that Donna was attempting to align the children against Burt. Based on the information that he had before him, Dr. Diner stated that he did not think that the children would be "well served" by relocation to Florida, but he candidly observed that he has not seen any of the subjects of his psychological evaluations in over a year and a half.

Donna testified that she was "retired" and currently resided with the children in a beach-front home in Bonita Springs, Florida, that she was renting for $7000 a month. That home enabled Brooke to occupy the "lower level," which had a private bath, television room, and extra bedroom. Jake was upstairs with a bedroom that overlooked the beach. Donna stated that she planned to live there for a few months before purchasing property in the same community.

Donna was questioned at length about emails she sent to Burt. In the first one, dated April 24, 2008, she informed him that her new residence in Rogers was in a gated community and told Burt to use the call box rather than giving him the entry code. The second, dated January 14, 2008, referred to the "trust litigation"[1]

1. Donna and Burt put most of the assets of their jointly owned business ventures in trust for the children. Burt was the trustee. At the time of the custody hearing, the trust was worth approximately $30 million dollars, in no small part because Burt deposited $150,000 to $180,000 per month into the trust as rent for the business assets In the divorce's

that she initiated on behalf of her children, in which she stated that Jake was within two years of his majority, at which time he could pursue the matter of his own accord. It also chided Burt for walking into Brooke's room while she was naked and warned him not to "inappropriately 'bump' or hang on Brooke." It informed Burt that she advised Brooke that she was entitled to a "hoola hoop" of personal space.

When questioned at the hearing, Donna affirmed that she thought Burt was looting the children's trust, and although she claimed to hope that Burt was not molesting Brooke, Donna did not disavow what the email suggested, that she thought that Burt was engaging in sexually perverse conduct with his daughter. The third email, dated January 23, 2008, indicated that Donna intended to inform the children that Burt was opposing her move to Florida. Donna admitted showing the children the portion of the March 16, 2007 order, which stated that she had the right to relocate "anywhere." Donna stated that she intended to relocate to Florida, with or without the children. She was not swayed by Dr. Diner's opinion that it was not in the children's best interest.

¶6Donna also confirmed that her personal assistant, Jeanne Nutter, had told Brooke about her being molested as a child and asked Brooke if she had been "inappropriately touched" by Burt. Donna stated that she talked with Brooke about Nutter's disclosure but did not suggest that the question about Burt was in any way inappropriate.

Regarding the potential for disruption in the children's lives engendered by the move to Florida, Donna acknowledged that the children had been enrolled in Shiloh Christian School for their entire academic lives. She confirmed that they were both "A/B" students and that both her children had school friends. Nonetheless, she regarded the move as an opportunity for the children to expand their horizons, asserting that the children's new high school was substantially larger than Shiloh, but offered many more courses. She also believed that placing Jake in a public school would better prepare him for his transition to college.

Donna was then questioned about events surrounding the euthanizing of the family's golden retriever. She stated that she picked up the dog from Burt's garage while he was away and that the dog was in "pathetic" condition—rear legs paralyzed, incontinent, bloody ears, and covered with ticks, feces, and urine. She asked the vet if, based on the condition of the dog, she could report Burt for animal abuse.

When questioned about her plan for affording Burt meaningful visitation, Donna noted that there were several flights between Fort Myers and Northwest Arkansas. She admitted, however, that her proposed visitation schedule would require the children to miss a half-dozen "personal days" from school each year. She made it clear that she had relocated to Florida, and ¶7intended to stay there, with or without the children. Donna stated that while she had friends, she had no extended family in Northwest Arkansas.

Jeanne Nutter testified about the events surrounding her disclosure to Brooke that she had been sexually molested as a fourteen-year-old. She claimed she shared that story because Brooke did not want to

property settlement, Burt retained the parties' candle and pot pourri business, and Donna was given $16 million in cash. Burt pledged the business assets as collateral to secure the loans necessary to raise the cash for the settlement. Donna brought suit as the children's next friend challenging this practice. For the most part, the trial court ruled in favor of Burt. The court of appeals affirmed on September 9, 2009.

visit her dad that day. Nutter admitted that she had previously made defamatory remarks about Burt, which resulted in Burt receiving a $31,000 settlement when he threatened to sue. Nutter recalled further conversations with Brooke, including one where Brooke told her that when she was riding in a truck with her father, he touched her "boobs." Nutter also testified that Brooke told her about the time when Burt walked into the bathroom when Brooke was naked. Nutter also claimed to have "suspicions" about Burt molesting Jake.

Anita Hanna, Burt's sister-in-law, testified that her family and "Burt's family" are very close. They live next door, she has children close in age to Jake and Brooke, and the children are in her house "a lot." She described the extended Hanna family as "wonderful" and "very welcoming." Burt's father was the mayor and Burt and his brother Thad "know everybody." Anita stated that she had often observed Burt interact with his children and never saw anything inappropriate. She noted, however, that during weekend visitation, "at first Jake is very reserved and has a guard up," but "as he spends time with his father, he starts to relax and he's back to what I would call himself." Anita opined, "It's like he has a lot of pressure so his guard is up." She thought that Brooke was different, noting that she could "be with her dad and be herself." However, she had observed them outside the courtroom. When Burt tried to talk to her, "she wouldn't warm up." She observed Brooke "stiffen up when Donna walked by." Anita noted that Burt had previously had custody of Jake, but it did not turn out well. However, she did not fault Burt, and she could tell that "Jake was alienated from his father."

Thad Hanna, Burt's brother, testified that he worked at Hanna Candle with his brother. He asserted that he had an extremely close relationship with Burt and the children. He stated that he lived next door to Burt, and Burt's children had complete access to his home. Thad noted specifically that "Jake eats out of our refrigerator," and that the children have the access code to their garage door opener. Like Anita, Thad noted that Brooke "warms up almost immediately" when she visits her father, but Jake takes "almost a day to start warming up." He stated that Brooke's and Jake's relationship with his children is "really good," with both families enjoying summer vacations together.

Thad related specific incidents where Donna's animosity toward Burt was reflected in Jake's behavior. He noted that Jake refused to let Burt use his cell phone, asserting that his mother had told him not to. Thad also described Jake's reluctance to let his father drive the car that Donna had provided for him on a Chicago trip, stating, "I think Donna's position was that Burt was not authorized to drive her car and she would consider it theft if he drove it." Further, Thad related that there was a period of time when Jake would not allow his father to put his hand on his shoulder. According to Thad, Jake would knock his father's hand away and say "No touching. No touching." Thad, however, noted that Jake would not do that to him.

Thad also recalled an incident in August 2006 when Burt went to Donna's house to pick up Jake after summer visitation. When he pulled into the driveway, Jake came out and informed him that he was going to live with his mother. When Burt insisted that his son come with him, Jake smiled and said "Nope" and went back into the house. Burt called his attorney who advised him to wait on the porch for fifteen minutes. While he was doing so, two deputies pulled up in a marked police car and got out "with their hands on their

pistols." Thad knew the deputies and intervened, but he stated that "it was horrible to see those kids going through that."

Thad agreed that there was a time when Burt had custody of Jake and Donna had custody of Brooke that the children's relationship with their father was strained. He stated that Burt "quit trying to force Jake to live with him," believing that the children would come back to him. Thad opined that this strategy worked and that Burt's relationship with his children was now "wonderful." Thad stated unequivocally that he believed that Burt was fully capable of taking care of the children.

Burt acknowledged that when he agreed to give Donna full custody of the children, he had agreed that she could take the children out-of-state. He explained that he had given Donna custody because there was "so much turmoil in my kids' lives that the only thing I could do to help was to push back and let them come to me." He claimed it "relieved a lot of pressure." He admitted that he had behaved immaturely after his divorce but asserted that he was "over it." He noted that he had made overtures to Donna, like inviting her to spend Christmas Eve with his family, to try to improve relations.

Regarding the move to Florida, Burt asserted that while Donna regarded it as "no big deal," in reality it was an "ordeal," and he foresaw problems with the children being marooned overnight when they encountered a flight delay. Burt opined that the best interest of the children was to remain in the same area where they have lived their whole lives, where they have friends, family, and a church.

Burt stated that the changed circumstances since the March 2007 order included Donna's anger, which he believed had gotten worse, perhaps because she lost her trust case. He noted that since the entry of the order, Donna made the allegation of "inappropriate bumping, touching of Brooke," encouraged Jake to sue him, and her emails have gotten worse. He denied walking in on Brooke when she was naked. Burt further claimed that Donna was talking to the children about the parties' litigation, specifically citing comments that the children had made to him as proof. He stated that he believed that the children have been "poisoned" against him, and in the last four years his "rights as a parent have been taken away because everything I do gets questioned, challenged, filed suit against, whatever."

Burt did admit that Donna was "not all bad," that at times, she was cordial, and that she encouraged the children to make all the visits. He also conceded that Dr. Diner was correct when he stated that some of the problems that he had with Jake resulted from his "tendency to be more strict and controlling." However, Burt stated that he believed that he had overcome some of this problem over time. Conversely, he was not aware of anything that Donna had done to make his relationship with his children any better. Burt asserted that in the March 2007 order Donna had committed to foster a positive relationship between him and the children and that he did not believe that she had done that.

Donna called both children in her case-in-chief. However, over Donna's objection, the children testified outside of the presence of their parents. Donna was called to the stand and stated that her primary reason for wanting to be present was that she "needed to hear" if the children were telling the attorney ad litem, Curtis Hogue, different information than they were telling her. The trial judge did not reconsider. By agreement of trial counsel, the trial judge conducted all the questioning.

Brooke stated that she was "nervous" to speak in front of her parents. She described "the whole process with my parents being separated and divorced is a living hell." Brooke stated that she would "practically die living with my dad." She claimed he was "always at work" and that her mom was "the person that raised me." Nonetheless, Brooke admitted that she had a "really good" relationship with her father and that she still wanted to visit him. She stated that her mother "feels like the guardian for me where my dad feels more like my friend." She claimed that her father "touched her inappropriately." She stated that "it got to a point where I wouldn't even notice it and he'd just walk by and his hand would touch me like inappropriately." She was not sure if it was on purpose, but she thought it was. However, while Brooke stated that she would do "anything" to live with her mom, she denied that she would say she had been molested to accomplish that goal. Regarding the move, she believed that moving to Florida would "open more doors" for her. She doubted that her brother would have a problem with the move because he did not have any close friends.

Jake testified that he was glad that his parents were not in the courtroom. He lamented that the ongoing litigation between his parents had gone on "too long." Jake noted that he had lived with both parents, post-divorce, but preferred to live with his mom, who needed him. He saw no problem with the move because he was tired of his old school and had no really close friends. He stated that he had a positive relationship with his dad and that he would like to visit him. Jake claimed that his mother did not denigrate his father. However, he claimed that the "main reason" he wanted to live with his mother was that she was "always there" and his father "had a business to run."

Although the attorney ad litem, Curtis Hogue, initially declined to make a custody recommendation, at the close of the hearing, he offered an opinion. He noted that in his report, he had focused on the relocation issue and opposed the move. Further, however, he opined that, "based almost exclusively on the testimony of Donna," the children would be better served by being placed in their father's custody. He pointed to Donna's insistence that she intended to relocate to Florida, regardless of whether the children relocated. Further, he stated that he believed that Donna's sharing the court order with Jake put him in the position of "taking sides." Hogue addressed the "inappropriate touching" issue by saying that he believed Brooke when she told him that "her dad had never molested her and would never molest her." He also believed that there was a pattern of conduct that indicated that Donna was trying to alienate the children from their father. Hogue noted that the emails were strong evidence of this attempt at alienation. Conversely, he found Burt to be "mature and thoughtful as it related to the custody of the children." He noted that Burt signed the March 2007 order to "calm the turmoil," which he considered "positive parenting."

The trial judge denied Donna permission to relocate the children to Florida and changed custody. She supported her decision with more than thirty-five pages of oral findings. The trial judge noted that since the parties divorced in July 2005, they were constantly involved in litigation, with Donna filing six contempt petitions and Burt three, and Donna filing five petitions for modification and Burt one. Donna sued Burt over the handling of the children's trust. The trial judge found that Donna's reasons for wanting to relocate were personal to her and did not involve

the children. She noted further that the children had attended Shiloh Christian for their entire school careers and opined that it would be "detrimental" for children to leave the school as well as a twenty-seven-member extended family and life-long friends. Further, based on Brooke's testimony that she would do anything, including make false accusations that her father had inappropriately touched her, to live with her mom, the trial judge found that Donna had caused "irreparable damage to the relationship between Brooke and her father." As far as the children's stated preference for relocating to Florida, the trial judge found that their statements sounded "rehearsed." She agreed with, and adopted, the attorney ad litem's recommendation against allowing relocation.

Regarding custody, the trial judge found a material change in circumstances in an escalation of the "parental alienation conduct" by Donna. She noted that Donna did engage in such conduct, such as the "porch incident" where Donna called the police while Burt waited to pick up Jake at the conclusion of the summer visitation, prior to the March 2007 order. However, since then, Donna threatened in front of the children to report Burt for animal cruelty, reported Burt to DHS for physical abuse, which was unfounded, "brought [Brooke] into this" with the bumping and inappropriate touching allegations to the point that Brooke "said to the Court that she was willing to say her father molested her to be able to go live with her mom." [2] Further, the trial judge found that Donna had called Burt names, and threatened to encourage Jake to sue his father over his handling of the trust. The trial judge specifically referred to the incident where Burt allegedly walked in on Brooke while she was naked, which Burt denied, and found that Donna either had a "different perception of the truth" or was being "deceitful to this Court." She found a similar situation in Donna's testimony concerning the incident where she had the family dog euthanized and the time when Burt drove Jake's car in Chicago. She concluded that "if ever there was a chance for Burt to salvage any sort of future relationship with his children, it must be now."

█ Donna first argues on appeal that the trial court erred in considering evidence that "went behind" the last order when the evidence was erroneously found to have occurred in the time since the last order because it caused the trial court to weigh the old evidence in its analysis of whether there was a material change in circumstances and whether a change of custody was in the best interest of the children. She specifically objects to the psychological evaluation performed by Dr. Diner as well as the notes and reports used by him in conducting the evaluation, which was "simply tainted by the fact of its age." She also points to the so-called "porch incident," in which she called the police to extricate Burt from her front porch, noting that both Burt and his brother Thad testified that the incident took place in August 2006. She, however, undercuts the importance of this example by conceding that the trial judge indicated that she was aware that the incident predated the March 2007 order. Finally, and more significantly, she notes that the trial court erroneously stated in her findings that the "choking incident" and her report alleging child-abuse to DHS, which was subsequently determined to be "unfounded," occurred after the March 2007 order. In fact, the incident occurred in December

---

2. We note that when Brooke testified, she actually denied that she would make false accusations of molestation.

2005. Even so, we do not find this argument persuasive.

As noted previously, in custody matters, a trial judge may consider facts affecting the best interest of the child that were "either not presented to the trial court or were not known by the trial court at the time the original custody order was entered." *Alphin*, 364 Ark. at 340, 219 S.W.3d at 165. Furthermore, in her lengthy findings of fact, the trial judge stated that she intended to use prior incidents primarily to establish the course of conduct of the parties. Finally, we are unaware of any authority, and Donna has not cited any, that holds that a psychological evaluation involving teenagers somehow becomes stale after the passage of a few months. Accordingly, we hold that the trial court did not err in its use of the evidence presented at the hearing.

■ Donna next argues that the trial court erred in determining that parental alienation had occurred where there was no showing that her offending acts actually caused the children to view their father in a negative light where there was no evidence that the children were even aware of the acts and where there was evidence that the father himself was the cause of any discord and alienation between himself and the children. She acknowledges that parental alienation can be grounds for a change of custody. *Sharp v. Keeler*, 99 Ark.App. 42, 256 S.W.3d 528 (2007); *Carver v. May*, 81 Ark.App. 292, 101 S.W.3d 256 (2003); *Turner v. Benson*, 59 Ark.App. 108, 953 S.W.2d 596 (1997). Appellant, however, asserts that the trial court erred in finding alienation in this case. She contends that no one disputes that in the year and a half that her children were in her custody, their relationship with their father had improved markedly. Additionally, it was uncontroverted that she has not withheld visitation. We do not find this argument persuasive.

■ Contrary to Donna's assertion, when a trial court finds a custodial parent is attempting parental alienation, it is not necessary that he or she complete the process before the trial court is justified in changing custody. In *Benson*, this court affirmed a change of custody where a father and son still had a good relationship, but there was testimony that the son was uncomfortable in expressing that he enjoyed his visit when he returned to the custodial parent. We stated, "Whether one parent is alienating a child from the other is an important factor to be considered in change of custody cases, for, just as the chancellor noted below, a caring relationship with both parents is essential to a healthy upbringing." 59 Ark.App. at 113, 953 S.W.2d at 598. We also believe that the instant case is analogous to *Carver*, where we affirmed a finding of parental alienation where the custodial parent was apparently behind unfounded sexual-abuse allegations made against the noncustodial parent. While we acknowledge that in both *Carver* and *Benson*, the custodial parent did interfere with visitation, our focus was in both cases, as it is here, on the actions of the custodial parent to destroy the relationship with the noncustodial parent. We can think of nothing more detrimental to a caring relationship between a child and a noncustodial parent than when every casual physical contact between the noncustodial parent and the child is called sexual abuse by the custodial parent, and he or she influences the child to interpret these incidents as such. Here the trial court found that Donna was trying to alienate the children from Burt in this fashion, and we cannot say that this finding is clearly against the preponderance of the evidence.

■ Donna's next two points concern the effect of her intention to relocate the children to Florida on the trial court's decision to change custody. She first asserts that the trial court erred when it found that the noncustodial parent rebutted the presumption in favor of her relocation to Florida because there was insufficient evidence concerning the *Hollandsworth* factors to overcome the presumption. In *Hollandsworth v. Knyzewski*, 353 Ark. 470, 109 S.W.3d 653 (2003), our supreme court held that relocation alone is not a material change in circumstances and announced that there is a presumption in favor of relocation for custodial parents having primary custody. It made it clear in *Hollandsworth* that the custodial parent no longer has the responsibility to prove a real advantage to herself or himself and to the children in relocating. Rather, the noncustodial parent has the burden to rebut the relocation presumption. The *Hollandsworth* court explained that the polestar in making a relocation determination is the best interests of the child, and that the court should take into consideration the following factors: (1) the reason for the relocation; (2) the educational, health, and leisure opportunities available in the location in which the custodial parent and children will relocate; (3) visitation and communication schedule for the noncustodial parent; (4) the effect of the move on the extended family relationships in the location in which the custodial parent and children will relocate, as well as Arkansas; (5) preference of the child, including the age, maturity, and the reasons given by the child as to his or her preference. 353 Ark. at 485, 109 S.W.3d at 663–64.

We do not believe that the trial court erred in finding that Burt rebutted the presumption in favor of Donna being allowed to relocate with the children. The trial court's conclusion that Donna's reason for the move were "personal" and that she was indifferent to the welfare of the children when she made this decision was based on Donna's own in-court statement that she intended to move, with or without them. This statement is especially telling in light of Dr. Diner's opinion that Jake would have a very difficult time adjusting to the move. Further, the trial judge specifically found that the stated preferences of the children regarding relocation sounded "rehearsed." As noted previously, it is our practice to defer to the trial judge to determine the credibility of witnesses and the weight to be afforded their testimony. Also, the trial judge gave considerable weight to the effect that the move would have on the exceptionally close extended-family relationships that the children enjoyed in northwest Arkansas. Under these circumstances, we cannot say that the trial judge clearly erred in disallowing Donna's relocation of the children to Florida.

■ Donna next argues that the trial court erred when it failed to find that the issue of relocation was not res judicata and that Burt was precluded from relitigating the issue. We disagree. In *Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002), the supreme court acknowledged that the doctrine of res judicata bars the relitigation of claims that were actually litigated in the first suit as well as those that could have been litigated, but noted that the doctrine did not strictly apply to custody matters. It favored what it referred to as "a more flexible approach" to res judicata, reserving for the trial court the power to respond to changed circumstances and the best interest of the child.

■ Finally, Donna argues that the trial court erred in removing her from the courtroom without cause and over her ob-

jection so that she was precluded from hearing the testimony of the two teenage children. She concedes that the constitutional right to confrontation does not exist in civil trials, yet nonetheless suggests that the trial judge's decision to question the children outside of her presence was tantamount to "secrecy," which offends public policy. Donna contends that she was prejudiced because she was unable to communicate with her attorney, precluded from suggesting points for her counsel to address during examination, prevented from informing her attorney of possible oversights or mistakes in subsequent testimony, and if she had been present, she could have "been made privy to important issues that involved her children's safety and well being." We find no merit to this argument.

Contrary to Donna's assertions, this was hardly a "secret" phase of this lengthy proceeding. Her trial counsel was present, and a verbatim record was made of the children's testimony. *See Mattocks v. Mattocks,* 66 Ark.App. 77, 986 S.W.2d 890 (1999). Moreover, the prejudice that she asserts, not being able to direct her lawyer, is of no moment inasmuch as, by agreement of trial counsel, the trial judge did all the questioning of the children. Further, Donna was given opportunity to state on the record why she needed to be present when the children testified, and the only substantive reason she gave was to "hear" how many times the children met with the attorney ad litem. This reason is not even mentioned on appeal. Finally, we note that under our rules of evidence, a trial court has broad discretion in fulfilling its requirement to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect the

witnesses from harassment or undue embarrassment." Ark. R. Evid. 611(a) (2009). We cannot say that the trial court abused its discretion in conducting the examination of the children outside the presence of the parents.

Affirmed.

PITTMAN and GLADWIN, JJ., agree.