Cite as 2021 Ark. App. 359

# ARKANSAS COURT OF APPEALS

DIVISION III

**No.** CV-20-417

|  |  |
|---|---|
|  | **Opinion Delivered** September 22, 2021 |
| KRISTINA BONDS (NOW EMMONS) | APPEAL FROM THE POPE COUNTY CIRCUIT COURT [NO. 58DR-14-381] |
| APPELLANT |  |
| V. | HONORABLE GORDON W. "MACK" MCCAIN, JR., JUDGE |
| CLAY BONDS |  |
| APPELLEE | REVERSED |

## WAYMOND M. BROWN, Judge

Appellant Kristina Emmons appeals the Pope County Circuit Court's order modifying custody of her two minor children, P.B. and T.B., removing the children from her custody and placing them in the custody of their father, appellee Clay Bonds.[1]  On appeal, Emmons argues that the circuit court (1) clearly erred in finding a material change in circumstances, (2) erred in determining that a change in custody was in the children's best interest, and (3) abused its discretion in awarding attorney's fees to Bonds.  Because we agree that no material change in circumstances occurred warranting a change in child custody, we reverse.

---

[1]We reversed a previous modification of the parties' child-custody arrangement upon concluding that no material change in circumstances had occurred. *See Bonds v. Bonds*, 2017 Ark. App. 518, 529 S.W.3d 671.

The parties divorced in November 2015. The agreed divorce decree awarded Emmons sole legal custody of the minor children, subject to Bonds's liberal visitation rights. In August 2016, Bonds was awarded custody of the minor children. Emmons appealed, and this court reversed finding that, after a thorough review of the record, there was "no independent basis for concluding that a material change in circumstances occurred."[2] Bonds again moved to modify custody and petitioned for contempt in June 2018, alleging the following changes in circumstances:

a. While Plaintiff was visiting with both of his minor children, he has taken the minor child, [P.B.] who is the oldest child to the movies on two separate occasions. Prior to taking [P.B.] to the movie, he checked the reviews for both movie [*sic*], and he did not feel that [T.B.] was old enough to see the movie [P.B.] wanted to see, although the movies [P.B.] was going to see was appropriate for his age. While at the movies Plaintiff's fiancé entertained the minor child [T.B.] by going out to eat and playing games. [T.B.] was also taken to a different movie at a different time. When Defendant found out that [P.B.] was taken to the movie and not [T.B.], Defendant became upset and told the minor child [T.B.] that his dad was not being fair to him and took [T.B.] to the movies on one occasion and then to get ice cream on a separate occasion and told [P.B.] that he was not allowed to go to the movie.

b. Any time that the Defendant inquires if Plaintiff has asked anything about what is going on at his home, Defendant becomes upset and calls [P.B.] "dad's little spy."

c. [P.B.] reported to the school counselor and his teacher that Barron Shaw (Defendant's boyfriend) took his wallet and that he had $11.00 when it was taken and when it was given back to him the $11.00 was gone.

d. When the minor children first returned to the custody of the Defendant in December 2017, Defendant was advised by Plaintiff that the minor children were having a difficult time and that they needed to talk to a counselor. Plaintiff told Defendant that he was going to contact the school counselor to make them aware of the situation. Defendant was adamant that the Plaintiff not contact the school counselor. The discussion was by e-mail between the parties and Defendant took the e-mail to her attorney who then contacted Plaintiff through his counsel stating

---

[2]*Id.*

2

that Plaintiff was being accusatory and derogatory towards her. Despite the fact that Defendant agreed that the minor children needed counseling and that a counseling appointment was to be made, to Plaintiff's knowledge none was ever made with any school counselor or a therapist.

e. Attached are two letters written by [P.B.] as Exhibit "A" and "B", Exhibit "A" being written on March 11, 2018 and Exhibit "B" being written on April 22, 2018. The letters detail the fact that [P.B.] has attempted to talk to his mother regarding him having a bad day and her response was, "Well, fuck, I have been having a super shitty day."

f. Rebecca Johnson, [P.B.]'s school counselor forwarded an e-mail to Plaintiff stating that she had concerns about a poem written by [P.B.] that is attached hereto as Exhibit "C". The poem depicts not only [P.B.]'s desires, but he also states that he hears bad words from his mother.

g. Inappropriate language regarding both Defendant and Barron Shaw has been a long standing issue between the parties.

h. On January 13, 2018 Plaintiff had the minor children for the weekend and noticed that [T.B.] had ringworm. The minor child stated that no one was treating the ringworm and Plaintiff contacted the Defendant and was unaware, and wanted to see a picture. A picture was sent to her and instructions for treating the ringworm were sent.

i. On January 27, 2018 while Plaintiff had visitation with his minor children, [T.B.]'s ringworm was worse and had multiplied from one spot to eight to nine spots. Defendant asked for pictures, and pictures were sent to her. The minor child at the time was six years old and Plaintiff suggested that she assist him with bathing so she could see that the child not only had a ringworm, but that it was consistently getting worse. Defendant replied that she saw no reason to bathe the minor child, as he is old enough to bathe himself.

j. February 10, 2018 the minor children were back for visitation with the Plaintiff and [T.B.] had head lice. Again, Defendant was not aware and Plaintiff suggested that someone help him bathe so that these issues would not go unnoticed. The response to Plaintiff was that he was old enough to bathe himself and she would not be helping him. Eventually, she did concede that she would help him dry off. See attached Exhibit "D" and "E".

k. On the youngest child [T.B.]'s birthday, Defendant asked the minor child who he wanted at his birthday party. [T.B.] told Defendant that he did not want his older brother [P.B.] to be invited. Defendant told [P.B.] that it was [T.B.]'s birthday and he got to choose who was invited. Believing that it was a party for

first graders, Plaintiff inquired only to find out that it was a sleep over and that [T.B.], Barron Shaw's two children and his two cousins were invited, and that he was the only family member that did not get invited. [P.B.] was sent to a friend's house to stay the night. He was provided a piece of cake the next day.

l. On February 28, 2018 Plaintiff inquired about the minor child [T.B.]'s progress report and Defendant stated that he did not get one, that he only had some testing reports. Plaintiff contacted [T.B.]'s teacher asking about the grades since he did not receive a progress report. The teacher e-mailed back that he did receive a progress report and that it had been sent home the previous week. See Exhibit "F" and "G". The following day the Plaintiff asked the Defendant for screenshots of the testing reports. The Defendant sent screen shots along with the progress report that she previously said she did not receive. [T.B.] was falling behind in Benchmark on his reading level.

m. On April 20, 2018 the minor children came to the Plaintiff for their regular visitation weekend. The minor child [P.B.] was wearing women's jeans that were too big for him. Plaintiff confirmed online that they were women's jeans and sent the minor child home in jeans from his home. Defendant insisted that they were not women's jeans, although Plaintiff sent the Defendant a photo of the jeans along with a screen shot of an internet search showing that they were women's jeans.

n. On May 4, 2018 it was discovered that [P.B.] had a ringworm.

o. The minor child has told the Plaintiff the following statements:

   I.   "I feel like I am invisible there. I feel like I am a satellite in space."
   II.  "I am not happy there and my mom is mad at me a lot."

p. The minor child [P.B.] was playing with friends that live near him and they had been walking around the neighborhood. They had been to a pond a couple of times and he said that it took him 30 minutes to get to the pond and that and [*sic*] he got separated from the boys and got lost when trying to get back home. [P.B.] reported that his two friends that he eventually got separated from had knives in case anything tried to attack them. [P.B.] stated that it took him an hour to return home after he got lost. When confronted, Defendant stated that she did not know that he was at the pond and that he had previously been told not to go there and was unaware of any knives. The Defendant became upset at [P.B.], not for going to the pond against her wishes or direct statements, but because he had told his dad about the incident. When the minor child went back to the Defendant's home, the Defendant stated that they had to take a walk to the pond because of his "big fat mouth."

The motion to change custody alleged that the foregoing instances "represent a change of circumstances, and it would be in the children's best interest that custody be placed with the Plaintiff." In her response to Bonds's motion to modify custody, Emmons denied any material change of circumstances justifying modification of the parties' order of custody and requested that the petition be dismissed pursuant to Rule 12(b)(6) of the Arkansas Rules of Civil Procedure for failure to state a claim upon which relief could be granted.

The circuit court held the initial part of the custody hearing on October 1–2, 2019. On the second day of the hearing, the court appointed attorney ad litem Mark Carter for the minor children and continued the case to December 3. Among the ad litem's recommendations filed with the court on December 12 were the following: He was unable to conclude there had been a material change in circumstances and could not "in good conscience state that it would be in either child's best interest" to modify custody. He noted that P.B. had a strong preference to live with his father, while T.B. had no preference. The ad litem stated that family counseling would be in the best interest of the children as well as individual counseling for P.B. He additionally stated that the actions of both parents, the "mother's continued derogatory statements about his father, and his father's encouragement to write down, date, and review [P.B.]'s recollection of these statements are damaging to the child." While observing Emmons's and Bonds's disdain for one another, the ad litem remarked that both "individually, appear to be loving parents to [P.B.] and [T.B.]."

On December 19, the circuit court entered an order granting Bonds's motion to modify custody. Emmons now appeals.

5

In reviewing child-custody cases, we consider the evidence de novo, but we will not reverse the circuit court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence.[3] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made.[4] It is well settled that the primary consideration is the welfare and best interest of the child, while other considerations are merely secondary.[5] We give special deference to the superior position of the circuit court to evaluate and judge the credibility of the witnesses, and this deference to the circuit court is even greater in cases involving child custody, as a heavier burden is placed on the circuit court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children.[6]

For her first point on appeal, Emmons argues that the circuit court's finding that there was a material change in circumstances sufficient to warrant a modification of custody was clearly erroneous. Arkansas law is well settled that the primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary.[7] Generally, courts impose more stringent standards for modifications in custody

---

[3]*McNutt v. Yates*, 2013 Ark. 427, 430 S.W.3d 91.

[4]*Boudreau v. Pierce*, 2011 Ark. App. 457, 384 S.W.3d 664.

[5]*McNutt, supra.*

[6]*Id.*

[7]*Harris v. Harris*, 2010 Ark. App. 160, 379 S.W.3d 8.

than they do for initial determinations of custody in order to promote stability and continuity in the life of the child and to discourage repeated litigation of the same issues.[8] The party seeking modification of the custody order has the burden of showing a material change in circumstances.[9] In order to change custody, the circuit court must first determine that a material change in circumstances has occurred since the last order of custody; if that threshold requirement is met, it must then determine who should have custody, with the sole consideration being the best interest of the children.[10] Determining whether there has been a change of circumstances requires a full consideration of the circumstances that existed when the last custody order was entered in comparison to the circumstances when the change of custody is considered.[11] The circuit court's findings on whether a material change in circumstances warrants a change in custody will not be reversed on appeal unless they are clearly erroneous.[12]

In the order entered on December 19, 2019, the circuit court found "that there has been a material change of circumstances since the entry of the last Order, and finds that it is in the best interest of the minor children that they be placed in the custody of [Bonds]." The order further provided,

> During the course of this trial I paid careful attention to each witness, observing their demeanor and comparing their presentation to the other testimony

[8]*Grisham v. Grisham*, 2009 Ark. App. 260.

[9]*Alphin v. Alphin*, 364 Ark. 332, 219 S.W.3d 160 (2005).

[10]*Tipton v. Aaron*, 87 Ark. App. 1, 185 S.W.3d 142 (2004).

[11]*Carver v. May*, 81 Ark. App. 292, 101 S.W.3d 256 (2003).

[12]*Shannon v. McJunkins*, 2010 Ark. App. 440, 376 S.W.3d 489.

and evidence submitted. The purpose of this observation was to determine the truthfulness of each witnesses' testimony and the weight to be aforewarded [*sic*] same.

As among the parties and the eldest child, the mother was by far the least credible. To some extent this finding is based on her physical response during cross examination. In addition there were inconsistencies in her testimony and a lack of corroboration by other evidence with regard to at least one of the central themes to her case.

It was undisputed that the parties had not communicated verbally with one another for years and that communication was via text and e-mail. Time and again the mother asserted the father had engaged in communications with the mother that were harsh, demeaning and consistently negative toward the mother. All of this occurring during the time that the parties were communicating via text and e-mail. There was not a single piece of documentary evidence of a text, e-mail or other written communication that came close to evidencing the use of the complained of action on the part of the father.

In addition to the mother's lack of veracity this Court finds that she has exhibited callousness toward the eldest child that leaves this Court with the distinct impression she simply doesn't like the child. The mother's failure to act on the eldest child's indication of self-loathing and self-harm, particularly in light of her professional training that would warrant immediate and specific action is indicative of this Court's perception of dislike of the eldest child by the mother. Further the mother's snide remarks to the child regarding his testimony in Court are found to be credible as alleged by the child and are consistent with the mother's underlying contempt for the young man. The mother's failure to notify the father of the child's statements regarding self-loathing and self-harm is one of the worst examples of parental failure to co-parent that I've seen.

In its order modifying custody, the circuit court largely concentrated its attention on Emmons's lack of credibility, pointing out "inconsistencies" in her testimony and detailing the lack of evidence of the harsh treatment Emmons suffered by Bonds. We give due deference to the circuit court's credibility determinations in custody cases because a heavier burden is placed on the circuit court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children.[13]

---

[13]*McNutt, supra.*

However, Emmons's credibility, or lack thereof, alone, does not amount to a material change in circumstances sufficient to warrant a change in child custody. The question still remains—Emmons's credibility aside—has there been a material change in circumstances since entry of the last order of custody? While we do not ignore the inappropriateness of harsh and profane language in the presence of minor children or negative comments regarding the other parent, nor do we take lightly P.B.'s self-harm statement, we hold that the answer is no. There is insufficient evidence to support a custody modification in the particular case before us.

Addressing the circuit court's findings regarding P.B.'s statement of self-harm and deeming Emmons's failure to seek counseling for him as parental failure and "consistent with the mother's underlying contempt for the young man," we note that the statement was made to Emmons's mother, Janice Emmons, while P.B. was in Bonds's primary custody. Also, as Janice testified at the custody hearing, P.B. made the self-harm statement out of frustration in response to an incident that occurred with Bonds and stated, "I can't ever do anything right." Furthermore, although Emmons did not secure individual counseling for P.B. following his self-harm statement, the record is replete with instances in which she requested family counseling, yet Bonds refused.

Regarding Bonds's parental-alienation argument, Bonds contends that Emmons has engaged in a pattern of trying to alienate him from P.B. and T.B. He asserts that Emmons makes derogatory comments about him in front of the minor children, calls him names such as "asshole" and "bitch," and does not support P.B.'s relationship with Bonds. Parental

9

alienation can be grounds for a change of custody.[14]  Whether one parent is alienating a child from the other parent is an important factor to be considered in change-of-custody cases.[15]  When the circuit court finds that a custodial parent is attempting parental alienation, it is unnecessary that the custodial parent complete the process before the circuit court is justified in changing custody.[16]

Here, the circuit court's order modifying custody was not based on a specific finding of parental alienation; nor do we, from our independent review of the record, find sufficient evidence to modify the parties' child-custody arrangement based on such a finding.  We are also unpersuaded by the authorities cited by Bonds in support of his parental-alienation argument.  In *Turner v. Benson*,[17] we held that the circuit court's finding of parental alienation was supported by the evidence.  Again, in the case at bar, the circuit court did not find that a pattern of parental alienation constituted a material change in circumstances.  Moreover, in *Turner*, the mother was interfering with the father's visitation with the children, and her animosity toward the father had already led one of the parties' children to become emotionally detached from him.  Here, there was no testimony that Emmons withheld visitation from Bonds nor was there evidence that his bond with the children was suffering.

---

[14]*Hanna*, 2010 Ark. App. 58, 377 S.W.3d 275.

[15]*Id.*

[16]*Id.*

[17]59 Ark. App. 108, 953 S.W.2d 596 (1997).

10

Bonds also cites *Szwedo v. Cyrus*,[18] in which this court affirmed the circuit court's finding of a material change in circumstances based on the increased "frequency of the alienating behaviors" and the "negative impact it is having on the children." Again, the case at hand is distinguishable, as there is no evidence that the minor children have been negatively impacted by Emmons's alienating conduct, as alleged by Bonds. Here, according to testimony provided at the hearing, the children are doing well academically, behaviorally, and socially. T.B.'s third-grade teacher, Terri Varner, testified that T.B. was chosen to receive the student-of-the-month award based on his respectful behavior. T.B. excels in math, and although he struggles with reading fluency, he is progressing. Likewise, Shelly McCain, T.B.'s second-grade teacher, testified that T.B. does well in math; however, reading does not come as easily for him. Neither teacher expressed concerns with T.B.'s hygiene, home life, or behavior. By all testimony, P.B. excels academically. P.B.'s school counselor, Chad Roberts, described P.B.'s grades as "fantastic" and observed no issues with P.B.'s behavior or emotional well-being. The undisputed testimony was that P.B. is very social and outgoing, has many friends, and participates in several extracurricular activities. Even Bonds acknowledged that P.B. does well academically and behaviorally. Further, the court-appointed ad litem, the only neutral party in the case, stated in his letter to the circuit court, "I cannot in good conscience state that it would be in either child's best interest" to modify custody and place P.B. and T.B. in the custody of Bonds. We find no merit to support Bonds's argument that Emmons's conduct amounted to parental alienation

---

[18]2020 Ark. App. 319, 602 S.W.3d 759.

constituting a material change in circumstances sufficient to warrant a change in child custody.

While our case law permits us to review the record and determine whether there was sufficient evidence from which the circuit court could have found a change in circumstances, after a thorough review of the record, we find no independent basis for concluding that a material change in circumstances occurred. Therefore, we reverse on this point.

Emmons next argues that the circuit court erred in determining that a modification of custody was in the children's best interest. However, we need not address this argument because we hold that the circuit court's finding that a material change in circumstances occurred was clearly erroneous.

Lastly, Emmons argues that the circuit court abused its discretion in awarding attorney's fees to Bonds. She asserts that Bonds was not entitled to attorney's fees because he failed to (1) establish a material change in circumstances and (2) timely file a motion for attorney's fees.

We review a circuit court's decision regarding an award of attorney's fees in a domestic-relations case for an abuse of discretion.[19] Bonds contends that he is "the prevailing party in all aspects of this litigation," and the determination of a prevailing party by the circuit court is a relevant consideration when choosing to award fees.[20] However, because we reverse the circuit court's modification of the parties' custody order, we also

---

[19]*Foster v. Foster*, 2016 Ark. 456, 506 S.W.3d 808.

[20]*See Folkers v. Buchy*, 2019 Ark. App. 30, 570 S.W.3d 496.

reverse the award of attorney's fees.  We need not address Emmons's argument regarding Bonds's failure to timely file a motion for attorney's fees.

Reversed.

GLADWIN and MURPHY, JJ., agree.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*; and *Peel Law Firm, P.A.*, by: *John R. Peel*, for appellant.

*Taylor & Taylor Law Firm, P.A.*, by: *Jennifer Williams Flinn*, *Andrew M. Taylor*, and *Tasha C. Taylor*, for appellee.