SLIP OPINION

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV–13–896

| | |
|---|---|
| | **Opinion Delivered** April 23, 2014 |
| CHRISTOPHER CHARLES BAKER<br>APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FOURTEENTH DIVISION |
| V. | [NO. 60DR–06–402] |
| STACI BAKER MURRAY<br>APPELLEE | HONORABLE VANN SMITH, JUDGE |
| | AFFIRMED |

## BRANDON J. HARRISON, Judge

Christopher Baker appeals a Pulaski County Circuit Court order denying his motion to hold his ex-wife, Staci Murray, in contempt and his attempt to change custody of his eight-year-old daughter, K.B., from Staci to himself. The heart of Baker's appeal is that the court misapplied the law and made clearly erroneous findings of fact. We affirm.

### I. *Background*

Christopher and Staci divorced in 2006, when K.B. was less than three months old. The divorce decree stated that the parties agreed that Staci would have custody of K.B. Both parties have since remarried and have families. Christopher moved to change custody in 2011, which the circuit court denied in an unappealed May 2011 order. Important to this appeal is the order's paragraph 11, titled "Counseling for the Child" and which states that Staci "shall enroll the minor child in counseling with a therapist who is qualified under her health insurance program." It also provides, among other things, that the parties and their spouses

shall cooperate with the therapist and participate in the counseling as directed by the therapist. The parties are ordered to comply with all requests of the therapist and to continue in the therapy sessions, allowing the child to do the same, until released by the therapist.

Staci was found in contempt of paragraph 11 in September 2011 because she had failed to promptly enroll K.B. in therapy. Over a year later, in December 2012, Christopher filed another motion for contempt and to change custody. Christopher alleged various ways in which Staci was in contempt and listed thirteen grounds for a material change of circumstances to support his change-of-custody argument. The court devoted two days to hearing Christopher's motion.

## II. *Custody-and-Contempt Hearing*

Matthew Frederick, Yolanda Thomas, Tonya Thomas, Patricia Baker, Christopher Baker, Chanti Edwards, and Staci Murray testified at the hearing. The testimony revealed that the parties have an acrimonious relationship and that K.B. has a difficult time going between houses. We summarize some of the testimony below.

Matthew Frederick, an expert in children and family social work, testified that K.B. had "shown marked improvement" in handling her anxiety about her parents' conflict since starting therapy in 2011. Frederick told the court that he had not released Staci from counseling when she withdrew from co-parenting therapy in May 2012 and that he had wanted Staci and her husband to continue coming. Frederick felt that it was in K.B.'s best interest for Staci to remain in the court-ordered, co-parenting therapy.

The families, by Frederick's suggestion, shared a Google calendar so everyone could schedule and stay informed about events in K.B.'s life. Patricia Baker, K.B.'s stepmother, testified that the calendar became ineffective because Staci would either put

2

events on there at the last minute or not at all so that she and Christopher would be left out. Staci produced some evidence that she had put events on the Google calendar. Christopher does not use email, so the couple uses Patricia's email account as a primary means to communicate with Staci. Patricia testified that there were some communication problems between she and Staci about agreed times for holidays and therapy appointments, but no "real issues with visitation."

During the course of the counseling, Frederick recommended that K.B. enroll in dance classes "because that's her passion." Staci eventually enrolled K.B. at a local dance studio that Frederick had suggested. K.B. regularly participates in dance and church activities, but Frederick testified that there is an excessive amount of parent tension surrounding K.B.'s dancing events at the studio and at church. Christopher was concerned that Staci did not let K.B. participate in more extracurricular activities and did not allow K.B. to call Christopher or to hang out with him apart from the standard visitation times. Staci denied keeping K.B. from Christopher.

Staci Murray testified that she had remarried since the last order was entered in the case, that K.B. has a good relationship with her son, T.M., and that she was due to give birth to a baby girl in a few months. Staci did not have any concerns about K.B. being jealous of her siblings or adjusting to the new baby. Frederick testified that K.B. had given him a drawing that K.B. interpreted to mean that her mom loved the new baby more than her. Frederick spoke with Staci about K.B.'s concerns and reported to the court that Staci was "very, very reassuring with K.B. She was very positive in her

response to K.B. and tried to clarify that she loves her as much as she loves her son [the baby]."

Both parents alleged that the other had physically abused K.B. in the past. According to Frederick, K.B. is spanked occasionally at her mother's house, but is not spanked at her father's house. Frederick explained that he is not "anti-corporal punishment" but had told the parents that he did not believe that corporal punishment is the best way to discipline K.B. because there were pictures of bruises (from a year and a half ago) and "who created the bruises . . . is up for debate." The court ruled that the bruising issue was raised and decided at the last hearing. Regarding a specific incident of corporal punishment of K.B., Frederick agreed that "Staci's spanking . . . was inappropriate in that context." On cross-examination Frederick said that spanking had only been brought up one time by K.B. and concluded that the spanking was "maybe not the best choice, but [it was] not [done] in an abusive manner."

Christopher told the court that he believed custody should be changed to him because, among other things, he did not feel that Staci was in tune with K.B.'s needs and strongly disagreed with her disciplinary methods. Patricia Baker testified that she and K.B. "have an excellent relationship." According to Matthew Frederick, K.B. puts the level of comfort she feels in expressing herself to people in this order: stepmother, father, mother, and when prompted, her stepfather. Based on his observation, Frederick indicated that Christopher and his wife were more likely to facilitate an equal and healthy relationship between both parents, and Staci caused more conflict than Christopher. Frederick, however, acknowledged that the parties had spoken harshly about one another at various

times and had a general inability to communicate or get along. When asked about Staci's behavior, Frederick specifically stated, "I have not seen something [from Staci] that rises to the level of parental alienation."

Frederick declined to make any change-of-custody recommendation to the court.

Yolanda Thomas, K.B.'s elementary school principal, testified that K.B. was either absent or tardy twenty days in three semesters. The school's policy requires parents to volunteer if their child receives six tardies in a semester as a deterrent to future tardies, and Staci performed the required volunteer work. According to K.B.'s third-grade teacher, Tonya Thomas, "K.B. is very outgoing. She's a very smart girl, at the top of her class. All positive things about her." Ms. Thomas did not think that K.B.'s tardiness adversely impacted her grades. Chante Edwards, who is the director of the daycare that K.B. attends and Staci's sister-in-law, said that K.B. is happy at the daycare and is never a discipline problem.

### III. *The Court's Order*

The court entered its final order on 5 July 2013. After a brief statement of the procedural and factual history between the parties and the testimony at the hearing, the court wrote:

> The continuing problem between the parties is a lack of communication. The parties have both remarried and even though the Plaintiff and Defendant will text each other on their phones, most of the communication is between the mother and step-mother. In fact, the step-mother types out all her husband's responses to the Defendant before sending them to her. Matthew Frederick testified that both parties have "fairly healthy relationships" with the new spouses and both are loving and caring couples. He admits that there is acrimony between the parties which causes the minor child to have anxiety and places her in a position of trying to make everyone happy. Therapy continued through August 2012 when

5

the Defendant decided additional counseling was unnecessary. Mr. Frederick stated that the Defendant's attitude was always respectful but she did not want to continue in a joint co-parenting situation. . . . Mr. Frederick concluded that the parents need to change how they interact with each other around the child and stated that both parents improved when they were in joint counseling. Mr. Frederick stated that he does not make a recommendation for a change of custody at this time but believes that the minor child should have more access with her father. Both parties and the other witnesses testified as to instances where they believe the other party was at fault in harming the relationship between the parties and K.B. Both parties are not perfect, but both parties and their new spouses are good, loving and caring adults who love K.B. very much.

The court ordered that the parties and K.B. continue in counseling with Matthew Frederick. The court noted that K.B. is an active child and is involved in many activities, and it required her parents to communicate and notify the other parent of K.B's activities using a calendar. The court ordered that both parties have access to the calendar and any updates that are made. The court also stated: "[Staci] has allowed the minor child to be tardy over twenty (20) times during the 2012-2013 school year. This is intolerable and cannot continue." The court denied all contempt motions and concluded that it had

heard all the testimony, reviewed the exhibits and other evidence submitted by the parties and finds that the Plaintiff has failed to sustain his burden for change of custody. The Court finds that it is in the best interest of the minor child that she remain in the custody of her mother.

IV. *Analysis*

In *Alphin v. Alphin*, 90 Ark. App. 71, 74–75, 204 S.W.3d 103, 105–06 (2005) (internal citations omitted), this court recited the law on modifying custody:

Although the trial court retains continuing power over the matter of child custody after the initial award, the original decree is a final adjudication of the proper person to have care and custody of the child. Before that order can be changed, there must be proof of material facts which were unknown to the court at that time, or proof that the conditions have so materially changed as to warrant modification and that the best interest of

the child requires it. The burden of proving such a change is on the party seeking the modification. The primary consideration is the best interest and welfare of the child, and all other considerations are secondary. Custody awards are not made or changed to punish or reward or gratify the desires of either parent.

In child-custody cases, we review the evidence de novo, but we do not reverse the findings of the trial court unless it is shown that they are clearly erroneous. A finding is clearly erroneous, when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. Because the question of whether the trial court's findings are clearly erroneous turns largely on the credibility of witnesses, we give special deference to the superior position of the trial judge to evaluate the witnesses, their testimony, and the child's best interest. There are no cases in which the superior position, ability, and opportunity of the trial judge to observe the parties carry as great a weight as those involving minor children.

We have divided Christopher's arguments into two categories: issues of law and issues of fact. And we will only address the arguments that Christopher has properly developed. *Spears v. Spears*, 339 Ark. 162, 3 S.W.3d 691 (1999).

### A. *Issues of Law*

Christopher first argues that the court's order is unclear because it does not specifically state whether a material change in circumstance has occurred. He correctly states that whether a material change of circumstance has occurred is a threshold issue in custody-modification cases. *Henley v. Medlock*, 97 Ark. App. 45, 244 S.W.3d 16 (2006). In deciding what a court's order means, the general rule is that we construe domestic-relations orders just like any other legal document, starting with the plain language. *See*

*Singletary v. Singletary*, 2013 Ark. 506. It is also worth noting that Arkansas's domestic-relations statute does not specifically require circuit courts to make findings when deciding whether to modify custody. Ark. Code Ann. § 9-13-101 (Repl. 2009).

Having read the order's plain language, we conclude that the court found that the threshold issue—a material change of circumstance—had not occurred. First, the order does not switch custody of K.B. from Staci. Second, the order plainly states that "[Christopher] failed to sustain his burden." Moreover, if Christopher had specific factual and legal findings he wanted the court to make then he could have requested them using a rule of civil procedure. Ark. R. Civ. P. 52 (2013). As the record stands, however, Christopher has not provided us a reason to reverse the court's order based on this particular content-related point.

Christopher also argues that the court failed to properly analyze the two-prong change-of-custody test because the order states, "it is in the best interest of the minor child that she remain in the custody of her mother" and because the court has some history of misapplying custody law. We are not persuaded. Even if we assume, as Christopher argues, that the court had found a material change of circumstance, the order can be reasonably read to determine that the court did not grant custody to Christopher because it found that it was in K.B.'s best interest to remain in her mother's custody. And the court did not improperly apply the law just because its order recites an alternative basis to support the ultimate custody-related ruling.

To the extent that the Christopher is arguing that we should reverse this case—or perhaps scrutinize the court with more rigor than we might other circuit courts—because

the circuit court in this case has a history of misapplying the law in custody cases, we reject his argument. Christopher also asserts that the court imposed an extra burden on him to prove that the alleged material changes in circumstances adversely affected K.B. We find no evidence in this record to support Christopher's assertion that the court imposed a heightened burden.

In sum, we reject Christopher's arguments that the court failed to properly identify and apply the applicable law.

B. *Issues of Fact*

Christopher's remaining arguments challenge the court's fact-finding function. He argues that the court erred in not granting him custody of K.B. because, to do so, the court had to ignore the "negative impact and damage" Staci has caused K.B. He argues that the court's findings were clearly erroneous and against the preponderance of the evidence. Christopher has abandoned any challenge to the court's refusal to find Staci in contempt; here he only challenges the court's findings of fact as they relate to the custody determination.

First, Christopher argues Staci's refusal to continue the court-ordered therapy was a material change of circumstance. True, there was unrefuted testimony at the hearing that Mr. Frederick had not released Staci from counseling, that he had wanted Staci and her husband to continue coming to the counseling sessions, and that Staci had decided not to continue with the counseling. Yet violating a court's order does not, in and of itself, compel a change of custody. *See Powell v. Marshall*, 88 Ark. App. 257, 197 S.W.3d 24 (2004). The violation is a factor to be considered, but it is not so conclusive as to require

the court to act contrary to the best interest of the child. *Id*. "To hold otherwise would permit the desire to punish a parent to override the paramount consideration in all custody cases, [that is], the welfare of the child involved." *Id*. at 266, 197 S.W.3d at 29. To ensure compliance with its orders, a court has the power of contempt, which should be used before the more drastic measure of changing custody. *Id*.

Here, the court's final order directs the parties to continue in therapy to improve their communication, and the court retains its power to hold Staci in the future. The court's decision not to use the "drastic measure" of a change of custody because Staci dropped out of therapy with Mr. Frederick was not clearly erroneous.

Second, Christopher argues that Staci made disparaging remarks and intentionally kept Christopher from participating in K.B.'s life. He contends that this pattern constitutes a material change of circumstance. A pattern of alienation can support a change of custody. *See, e.g., Turner v. Benson*, 59 Ark. App. 108, 109, 953 S.W.2d 596, 598 (1997) ("Whether one parent is alienating a child from the other is an important factor to be considered in change of custody cases."). Here, however, Frederick testified that Staci's actions did not rise to the level of alienation. He also said that both parties acted disrespectfully to each other now and then. The court addressed this issue in its order by noting, "The continuing problem between the parties is a lack of communication." The court then ordered that the parties use a calendar so that Christopher could be better informed on the events in K.B.'s life and that the parties communicate directly with each other. The court's findings on these points were not clearly erroneous.

SLIP OPINION

Third, Christopher argues that a material change in circumstance occurred when Staci remarried and K.B. felt that her mother favored the new baby over her. Christopher also challenges Staci's care of K.B., believing that Staci's spanking and screaming harm K.B. and that K.B. is more comfortable and free around Christopher and his wife. He argues that these facts create a material change in circumstances.

Remarriage alone is not a sufficient reason to change custody, though it may be considered as a factor in a change-of-circumstance analysis. *See Middleton v. Middleton*, 83 Ark. App. 7, 113 S.W.3d 625 (2003) (reversing because husband's remarriage and birth of new child did not constitute material change of circumstances sufficient to warrant change in custody); *see also Alphin v. Alphin*, 364 Ark. 332, 219 S.W.3d 160 (2005) (stable environment that had been enhanced by father's remarriage proper consideration in a holistic change-of-circumstance analysis). In its order the court explained that both sets of parents loved and cared for K.B. The court also noted that Frederick testified that Staci was "very reassuring" to K.B. as she explained that she still loved her after her son was born. As for the spanking and whether it presented a custody-related problem, we defer to the circuit court on this particular issue because it involves the parties' credibility and varying parenting styles. *See Hobby v. Walker*, 2011 Ark. App. 494, 385 S.W.3d 331 (explaining that father's strict parenting style was not enough to be a material change of circumstance). Frederick testified that while Staci's discipline techniques may not be the best, they were not done in an abusive manner. On this disputed record, we hold that the court's related findings were not clearly erroneous.

Fourth, Christopher argues that K.B.'s school performance and her lack of extracurricular activities are a material change of circumstances warranting a change of custody. Generally, disagreements on basic parenting choices are not material changes of circumstances. *See Hobby*, *supra*. In this particular case, there was ample factual support in the record for the court to reject Christopher's change–of–custody argument. And while the parental tension surrounding these events is apparently significant, it did not, in the circuit court's view, create a material change in circumstance finding. Given the standard of review and the record, we will not disturb the court's ruling on this point either.

V. *Conclusion*

We affirm the circuit court's decision that custody of K.B. remain with Staci Murray.

Affirmed.

GRUBER and PITTMAN, JJ., agree.

*Stephanie Chamberlin P.A.*, by: *Stephanie Chamberlin*, for appellant.

*Satterfield Law Firm, PLC*, by: *Cynthia S. Moody*, for appellee.