Cite as 2023 Ark. App. 317

# ARKANSAS COURT OF APPEALS
DIVISION IV
Nos. CV-22-240 & CV-22-718

CELESTE VEREEN

APPELLANT

V.

CHARLES VEREEN

APPELLEE

Opinion Delivered May 31, 2023

APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, ELEVENTH DIVISION
[NO. 60DR-10-122]

HONORABLE ANDREW GILL, JUDGE

AFFIRMED

## RAYMOND R. ABRAMSON, Judge

Celeste Vereen appeals the Pulaski County Circuit Court orders holding her in contempt, modifying custody of her children with her former spouse, Charles Vereen, and ordering her to pay Charles's attorney's fees.[1] On appeal, Celeste argues that the circuit court erred by finding her in willful violation of a court order and by finding that Charles established a material change in circumstances such that a change in custody was in the children's best interest. She further asserts that because the court erred by finding her in contempt and by modifying custody, the attorney's-fees award must be reversed. We affirm.

---

[1]Celeste filed two appeals: (1) an appeal of the order finding her in contempt and modifying custody and (2) an appeal of the attorney's-fees order. Her attorney filed with this court a motion to consolidate the appellate records, a motion that we initially mooted. We find it necessary to address the appeals together, and we sua sponte consolidate them. *See* Ark. R. App. P.-Civ. 3(c) (2022) (allowing this court to consolidate appeals upon our own motion); *House v. State*, 2015 Ark. App. 295.

Celeste and Vereen married on April 8, 2006. They had twins, minor child 1 (MC1) and minor child 2 (MC2), in July 2008. On October 4, 2010, they divorced, and their divorce decree provided that they have joint custody with Celeste being the primary custodial parent and Charles having reasonable visitation. Specifically, Charles had visitation every other weekend, overnight visitation on Tuesdays, and overnight visitation every other Wednesday. The decree further provided that Celeste and Charles share major decisions regarding the children's health, education, and welfare but that if they were unable to reach a joint decision, Celeste had "final say with regard to the major decisions."

On November 13, 2019, Celeste moved to modify Charles's visitation. She asked the court to strike the midweek overnight visitation on Tuesdays and Wednesdays and asked for only Tuesday visitations ending by 8:00 p.m. She alleged that Charles could not adequately care for or discipline the children and that he did not have them prepared for school following overnight visitations. She also requested that the court prohibit any corporal, physical, or other improper forms of punishment.

On March 19, 2021, Charles moved for contempt, asserting that Celeste had refused to include him in decisions regarding the children and that she had unilaterally denied him visitation. Also on March 19, Charles moved to modify custody, alleging that Celeste's exclusion of him from decision-making and her failure to allow visitation amounted to a material change in circumstances warranting modification of custody. He asserted that it was in the children's best interest to modify custody, and he asked for joint custody and final decision-making authority.

On September 3, the court entered an agreed temporary order requiring the parties to begin the reunification plan of family therapist Dr. Dawn Doray, for Charles's visitation. The court further ordered that Charles have visitation "at least each week, possibly more frequently as the parties' schedules allow."

On September 7, Celeste moved for contempt, alleging that Charles had attempted to enroll the children in a different school, made disparaging remarks about her in front of the children, failed to reimburse her for medical expenses, and threatened and harassed her.

The court held a hearing on September 29 and 30. Dana Herman testified that she is a licensed professional counselor and that she sees MC1 and MC2 in individual therapy. She stated that both children have anxiety disorder and dyslexia. She explained that in 2020, visitation with Charles began to stress and worry the children, and she noted that Charles had punished the children with physical activity and had threatened discipline over the phone. Herman explained that MC1 was more vocal in expressing dissatisfaction with Charles, which led to tension with Charles, and thus, in 2021, MC1 shut down and resisted seeing Charles. She noted that MC2 is less vocal and is more of "a peacekeeper" and that MC2 followed MC1's lead on the behavior.

Herman further stated that the children had reported to her that Celeste required them to attend visitations with Charles and that the children were frustrated with Celeste. Herman testified that she had advised Celeste to give the children consequences for resisting visitation and that MC1 had reported that Celeste had prohibited video games as punishment. She stated that Celeste's consequences, however, were ineffective.

3

Herman testified that she offered recommendations for Charles and that he tried to follow her advice but was not always consistent. She stated that due to the growing tension, she recommended the family see Dr. Doray for family therapy. She noted that "it's going to take some time to repair [the] relationship."

Dr. Doray testified that she began seeing the family for therapy in July 2021 to facilitate the resumption of Charles's visitations. She explained that during their initial sessions, MC1 reported having anticipatory anxiety concerning visitations with Charles, and MC2 reported that he did not want to attend visitations without MC1.

Dr. Doray noted that Charles "is a little more on the strict side" and Celeste "is more on the not so strict side." She stated that Charles implemented discipline in the form of physical activity and that the children had not responded well to the punishment. She noted that the children did not describe the activity as excessive and that Charles acknowledged that the physical-activity discipline had been unsuccessful. She noted that during her family-therapy sessions, the children progressed to having affectionate conversations with Charles. She further explained that she provided methods for reinstating visitations and that she helped plan visitations for July, August, and September 2021.

Dr. Doray stated that the first visitation she facilitated with Charles and the children occurred at a restaurant with other paternal family members and that the visit was a success. She stated that their second visitation, however, was a "disaster." She explained that they had planned to go swimming and then to dinner, but the pool was unexpectedly closed. She testified that MC1 then refused to leave Celeste's car, so MC2 attended the visitation alone.

Dr. Doray helped coordinate a third visitation at a movie theatre, but because she had not met with MC1 since the disastrous visit, she informed Celeste that MC1 could decide whether he wanted to attend the visitation. She testified that only MC2 attended the visitation at the theatre and that he enjoyed it.

Dr. Doray testified that she helped coordinate a fourth visitation in September and that because of MC1's concern about his schoolwork, they planned a dinner at a restaurant on a Saturday night. She stated that during the planning sessions, the children reported being comfortable with the dinner; however, the children later refused to attend. She explained that she met with the children following the failed visit and that MC1 reported being fearful that Charles would be upset with him for missing previous visitations. She further explained that MC2 did not want to see Charles in therapy that day, but when she informed him that it was "nonnegotiable," the children agreed to meet with Charles for therapy and that the session went well.

Dr. Doray also testified that during her sessions with the children, they reported playing eight hours of video games per day and having a bedtime of 11:30 p.m. She expressed concerns about the gaming and bedtime because the children had reported being overwhelmed with schoolwork and had been prescribed medication for sleeping difficulties. She also stated that MC1 had been prescribed an antidepressant, but he did not take it as prescribed.

Dr. Doray testified that Charles had followed her recommendations for resuming visitations and that she had no concerns with his relationship with the children. When asked

whether Celeste had followed her recommendations, Dr. Doray stated that Celeste had been bringing MC1 to therapy except when MC1 had refused. She noted that Celeste did not know how to force MC1 to obey her instructions and that she'd "rather not deal with this." Dr. Doray was concerned that Celeste's anxiety "might spill over to the" children, and she noted that Celeste is probably unaware that the children feel her anxiety.

Dr. Doray further testified that the children may need to spend time with Charles for shorter intervals on a more frequent basis, but she also discussed "ripping off the Band-Aid" as another possible transition. She stated that both are options, and she was concerned with Celeste's ability to require visitations over a longer transition period.

Celeste testified that, following the divorce, she had made the medical and educational decisions for the children and that Charles showed little interest. She explained that the children attended The Anthony School from kindergarten through the first semester of fourth grade, then Jefferson Elementary for the second semester of fourth grade and fifth grade, and then Christ Little Rock for one year of middle school. She stated that Christ Little Rock "was not an option to go back to," so she enrolled the children in Arkansas Virtual Academy. She acknowledged that Charles was opposed to sending the children to virtual school.

Celeste asked to modify the visitation schedule with Charles to remove the midweek visitations because the children's schoolwork had increased and they had difficulties completing their work. She also stated that Charles had used physical training as punishment for the children.

Celeste disagreed that she had not facilitated visitations with Charles. She testified that she pleaded and demanded that the children see Charles and that she gave them consequences if they did not attend visitations. She further testified that she discussed upcoming visitations with the children, helped them pack their bags, and noted "positives" about seeing Charles, such as interacting with their paternal family. Celeste stated that she also spoke with the children's therapist about their struggles and that the therapist would discuss the issues with the children in therapy. She denied allowing the children to miss visitations. She further testified that the children had free access to their phones to call Charles and that she suggested that they contact him.

Celeste stated that she last took away the children's electronics for not attending visitation with Charles prior to Dr. Doray's involvement—sometime in the summer of 2021. She noted that when she took away their electronics, the children could still watch television, and she did not otherwise punish them. She further stated that other than the visitation issues, the children are well behaved.

Celeste opposed joint custody with Charles because the children did not feel safe and secure with him. She stated that the children's living with Charles on a week-on, week-off basis would negatively affect their mental health.

Charles testified that he married his current wife, Ashlea, in May 2014; that they have a child together and that Ashlea has a child from a previous relationship. He explained that he is on active duty with the United States Army in the Arkansas National Guard. He noted,

7

however, that he was diagnosed with colon cancer in July 2020 and that he is in the medical-evaluation process. He stated that he is now in remission.

He explained that in 2020, his visitations began to deteriorate and then in January 2021, he underwent chemotherapy and contracted COVID-19, and his visitation "really went off the rails." He estimated that he had missed fifteen visitation days in 2020 and over one hundred visitation days between January and September 2021. He stated that he had "a handful visits, maybe four or five" from January 2021 until they started seeing Dr. Doray.

Charles testified that Celeste had refused to answer the door when he arrived to pick up the children and that she had failed to appear for exchanges. He explained that he made various efforts to see the children, such as meeting at alternate locations and picking them up from school, but Celeste resisted. He stated that for years, Celeste had prohibited him from picking up the children from school.

Charles explained that Celeste had moved the children to four different schools and that she determined their medications without consulting him. He stated that when the children moved to middle school at Christ Little Rock, he communicated with the teacher and was told that they received As and Bs. He stated, however, that they had over eighty absences.

Charles requested shared physical custody of the children. He stated that they need both their mother and their father in their lives, and he acknowledged that he had made mistakes in the past. Charles stated that he had implemented corporal punishment on the

8

children on one occasion, and he explained that he had received corporal punishment as a child.

Following the hearing, the court entered an order on December 30 finding Celeste in willful contempt for refusing to facilitate visitation and denying her contempt motion against Charles. The court additionally granted Charles's motion for modification of custody, and it found that Celeste's inability to facilitate visitation amounted to a material change in circumstances and that Celeste had "almost wholly denied [visitation] for a significant period of time." The court determined that Celeste "had control over visitation and although she claims she did what she could to facilitate visitation, some aspects of visitation were within her control and she still failed to facilitate visitation and meaningful contact between the children and [Charles]." The court further found that it was in the children's best interest to modify custody, and it found that the therapists did not have "legitimate concern[s]" with Charles. The court awarded joint physical custody with each parent spending equal time with the children. The court also ordered the parties to share all major decisions, but it awarded Celeste final authority for education decisions and Charles final authority for medical and extracurricular decision. The court stated that Charles "may submit a petition for attorney's fees," and it dismissed all pending motions.

On January 13, 2022, Charles moved for attorney's fees in the amount of $25,593.58. On January 28, Celeste appealed the order holding her in contempt and modifying custody.

On August 10, the court awarded Charles $25,593.58 in attorney's fees. In the order, the court noted that it had the power and discretion to award attorney's fees and costs in

9

domestic-relations actions and that it could award attorney's fees and costs for contempt. The court stated that it had granted Charles all relief requested, modified custody, and made a contempt finding against Celeste. On September 8, Celeste appealed the attorney's-fee award. We now turn to the merits of the appeal.

On appeal, Celeste first argues that the circuit court erred in finding her in contempt because she did not willfully fail to facilitate visitation. She asserts that the evidence established that Charles's visitations were interrupted due to the children's fear and anxiety about seeing him, and she claims that the therapists' testimony supports that conclusion. She also claims that Charles's cancer and COVID-19 diagnoses disturbed the visitations.

Willful disobedience of a valid order of a court is contemptuous behavior. *Omni Holding & Dev. Corp. v. 3D.S.A., Inc.*, 356 Ark. 440, 156 S.W.3d 228 (2004). Before a person may be found guilty of contempt, she must have violated a court order that is definite in its commands and clear as to what duties it imposes. *See Elder v. Elder*, 2018 Ark. App. 276, 549 S.W.3d 919. This court will not reverse a finding of civil contempt unless it is clearly against the preponderance of the evidence. *Id.* A finding of contempt is clearly against the preponderance of the evidence if, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*

In this case, we hold that the circuit court's contempt finding is not clearly against the preponderance of the evidence. Even though there was evidence that the children resisted visitations, Charles testified that he missed over one hundred visitation days between

10

January and September 2021. He stated that Celeste did not answer the door when he arrived to retrieve the children and that she failed to appear for exchanges. This case turned largely on the credibility of the witnesses, and the circuit court stated in its order that Celeste had control over visitation and that she failed to facilitate visitation and meaningful contact between the children and Charles. *See Ball v. Ball*, 2014 Ark. App. 432, 439 S.W.3d 92. Accordingly, a preponderance of the evidence supports the contempt finding.

Celeste next argues that the circuit court erred by finding that Charles established a material change in circumstances had occurred such that a modification of custody was in the children's best interest. She again asserts that the evidence shows that the children's resistance created the obstruction to Charles's visitations and that she actively supported the children's reconciliation with him. She further claims that the children do not feel safe with Charles and that he does not have the capacity to properly support them.

In reviewing child-custody cases, we consider the evidence de novo but will not reverse a circuit court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Hewett v. Hewett*, 2018 Ark. App. 235, 547 S.W.3d 138. We give due deference to the superior position of the circuit court to view and judge the credibility of the witnesses. *Id.* This deference is even greater in cases involving child custody, as a heavier burden is placed on the circuit court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Id.*

In order to modify a custody decree, the circuit court must apply a two-step process: first, the court must determine whether a material change in circumstances has occurred since the divorce decree was entered; second, if the court finds that there has been a material change in circumstances, the court must determine whether a change of custody is in the child's best interest. *Shell v. Twitty*, 2020 Ark. App. 459, 608 S.W.3d 926. Generally, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody. *Alphin v. Alphin*, 364 Ark. 332, 219 S.W.3d 160 (2005). The party seeking modification has the burden of showing a material change in circumstances. *Id.*

We hold that the circuit court did not err by finding that Charles established that a material change in circumstances had occurred such that a modification in custody was in the children's best interest. As discussed, Charles testified that he missed over one hundred visitation days and that Celeste refused to appear for the visitations. We have stated that a history of one parent denying visitation to the other parent amounts to a material change in circumstances. *Brand v. Mourot*, 2010 Ark. App. 701, at 6–7 (noting that "a single failure to allow visitation does not justify changing custody but multiple failures do"). Further, Dr. Doray testified that she had no concerns with Charles's parenting and spending time with the children. Change-of-custody decisions must be based on the particular facts and circumstances of each case in relation to the standard of the best interest of the child. *Schreckhise v. Parry*, 2019 Ark. App. 48, 568 S.W.3d 782; *Hudgens v. Martin*, 2009 Ark. App. 462. Given our standards, we must affirm the circuit court's finding that a material change

in circumstances occurred such that a modification in custody was in the children's best interest.

For her final argument, Celeste asserts that if this court reverses the circuit court's contempt finding or its custody modification, then this court must also reverse the award of attorney's fees. She does not otherwise challenge the award. Because we affirm the circuit court's findings, we decline to reverse the attorney's-fees award.

Affirmed.

HARRISON, C.J., and VIRDEN, J., agree.

*The Ballard Firm, P.A.*, by: *Andrew D. Ballard*, for appellant.

*Mann & Kemp, PLLC*, by: *Angela Mann*, for appellee.